**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| F. SCOTT BAUER and JEFFREY T. CLARK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| | ) | 1:13CV345 |
| SOUTHERN COMMUNITY FINANCIAL CORPORATION, SOUTHERN COMMUNITY FINANCIAL, LLC, SOUTHERN COMMUNITY BANK AND TRUST, WINSTON 23 CORPORATION, CAPITAL BANK CORPORATION, CAPITAL BANK FINANCIAL CORPORATION, and CAPITAL BANK, N.A., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants' Motion to Enlarge Page Limit [Doc. #28], Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure [Doc. #29], and Defendants' Motion for Leave to File Corrected Reply Brief in Support of Motion to Dismiss [Doc. #37]. For the reasons that follow, Defendants' Motion to Enlarge Page Limit is GRANTED, Defendants' Motion for Leave to File Corrected Reply Brief in

Support of Motion to Dismiss is GRANTED, Defendants' Motion to Dismiss is DENIED as MOOT, and the case is DISMISSED under Rule 12(h)(3) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction.

I.[1]

In 1995, Plaintiff F. Scott Bauer ("Bauer") founded Southern Community[2] in Winston-Salem, North Carolina and served as its Chief Executive Officer and President. Doc. #1 (Compl. ¶ 15). Plaintiff Jeffrey T. Clark ("Clark") joined Southern Community during its first year as Senior Vice President and Chief Commercial Banking Officer. Id. ¶ 16. As part of their employment with Southern Community, Bauer and Clark each had various employment agreements and benefit plans. Id. ¶ 18. At issue in this case are Bauer's and Clark's April 2006 Employment Agreements and March 2007 Salary Continuation Agreements. Id. ¶¶ 19-22; Compl. Exs. 1-4.[3]

---

[1] Because Defendants have filed a Motion to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, factual allegations will be construed in the light most favorable to Plaintiffs. Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir. 1992).

[2] Plaintiffs refer to Southern Community Bank and Trust and Southern Community Financial Corporation collectively as "Southern Community," at least in the numbered paragraphs. Compare Compl. ¶ 4 with Compl. p. 2-3.

[3] Plaintiffs filed a number of documents, including the Agreements at issue, in support of their Complaint. See infra § II. The Court has considered these documents as part of its review. See Tellabs, Inc. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S. Ct. 2499, 2509 (2007).

A.

Although Bauer and Clark entered into Employment Agreements, they could be terminated without cause with written notice sixty days in advance of the termination.[4] Compl. Ex. 1 (Bauer's Employment Agreement) ¶ 3.1(b); Compl. Ex. 3 (Clark's Employment Agreement) ¶ 3.1(b). In that event, the compensation and benefits after termination provisions of Sections 4.4 and 4.5 apply, in addition to other post-termination payments or benefits provided for in the Employment Agreements. Compl. Ex. 1 ¶ 3.1(b); Compl. Ex. 3 ¶ 3.1(b).

Bauer's and Clark's Employment Agreements also each provide benefits if a Change in Control were to occur during the term of the Employment Agreement. The Employment Agreements define Change in Control to mean a change in ownership, a change in effective control, or a change in ownership of a substantial portion of assets of Southern Community Financial Corporation. Compl. Ex. 1 Amended ¶ 5.2; Compl. Ex. 3 Amended ¶ 5.2.

According to their terms, the Employment Agreements were binding on the Employer's successors. Compl. Ex. 1 ¶ 8.1(a); Compl. Ex. 3 ¶ 8.1(a).

---

[4] Likewise, Bauer and Clark could terminate their employment with Southern Community upon sixty days written notice, with or without Good Reason, as it is defined in paragraph 3.2. Compl. Ex. 1 ¶ 3.2; Compl. Ex. 3 ¶ 3.2.

B.

In their Employment Agreements, Bauer and Clark anticipated the execution of Salary Continuation Agreements, which occurred the following year. Bauer's and Clark's Salary Continuation Agreements provide benefits similar to those described above. See Compl. Ex. 2 (Bauer's Salary Continuation Agreement); Compl. Ex. 4 (Clark's Salary Continuation Agreement). If a Change in Control were to occur after January 1, 2007, but before the Executive's Normal Retirement Age and before his Separation from Service, the Bank[5] would be required to pay the Executive the Change in Control benefit, instead of any other benefit provided for in the Salary Continuation Agreement. Compl. Ex. 2 ¶ 2.4; Compl. Ex. 4 ¶ 2.4. Change in Control is defined in the Salary Continuation Agreements as a change in ownership, a change in effective control, or a change in ownership of a substantial portion of assets of Southern Community Financial Corporation. Compl. Ex. 2 ¶ 1.4; Compl. Ex. 4 ¶ 1.4. Just as the Employment Agreements were binding on successors, so too, were the Salary Continuation Agreements. Compl. Ex. 2 ¶¶ 7.2, 7.5; Compl. Ex. 4 ¶¶ 7.2, 7.5.

---

[5] Southern Community Bank and Trust is referred to as "Bank" in the Salary Continuation Agreement.

C.

In early 2012, Capital Bank[6] approached Southern Community to discuss purchasing Southern Community. Compl. ¶ 37. On March 16, 2012, Southern Community and Capital Bank entered into an Agreement and Plan of Merger ("Plan of Merger"). Compl. ¶ 45 & Exs. 6, 7. Section 7.2(g) of the Plan of Merger required that Southern Community, Capital Bank, and individuals listed in the Parent Disclosure Schedule enter into amended employment arrangements and/or waivers pursuant to the Parent Disclosure Schedule. Compl. ¶ 47 & Ex. 6 at ¶ 7.2(g). According to Plaintiffs, the amended employment arrangements would have greatly reduced the value of the Employment Agreements, including reducing or eliminating the Change in Control benefits. Compl. ¶ 47. Nothing in the Plan of Merger required Capital Bank to expressly assume and agree to perform the Employment Agreements in the same manner and to the same extent that Southern Community would be required to perform them. Id. ¶ 48.

At the meeting during which the Board of Directors was considering whether to adopt the Plan of Merger, Bauer and Clark stated that, while they

---

[6] Defendants Winston 23 Corporation, Southern Community Financial, LLC, Capital Bank, N.A., Capital Bank Corporation, and Capital Bank Financial Corporation are referred to as "Capital Bank" in the Complaint, at least in the numbered paragraphs. Compare Compl. ¶ 5.c. with Compl. p. 2-3.

approved of the merger, they would not sign amendments to their Employment Agreements. Id. ¶ 51.   After the Plan of Merger was signed, Southern Community demanded that Bauer and Clark sign proposed amendments to their Employment Agreements and Salary Continuation Agreements, but they refused. Id. ¶¶ 52, 73.   According to Plaintiffs, the amendments would have changed Bauer's and Clark's job titles, replaced the Change in Control benefits with a smaller lump sum payment, removed provisions making the agreements binding on successors, removed provisions requiring Southern Community to pay Bauer's and Clark's legal fees associated with enforcing the agreements, and created a more stringent covenant not to compete. Id. ¶ 55.

Because Bauer and Clark refused to sign the proposed amendments, on July 24, 2012, Southern Community issued notices of termination without cause and terminated Bauer's and Clark's employment effective September 22, 2012. Id. ¶ 76 & Ex. 13.   On October 1, 2012, Southern Community and Capital Bank consummated Capital Bank's acquisition of Southern Community. Compl. ¶ 79.

II.

On April 26, 2013, Plaintiffs Bauer and Clark filed a Complaint against Defendants Southern Community Financial Corporation, Southern Community

Financial, LLC, Southern Community Bank and Trust, Winston 23 Corporation, Capital Bank Corporation, Capital Bank Financial Corporation, and Capital Bank, N.A., alleging breach of Bauer's and Clark's Employment Agreements (First Claim for Relief); in the alternative, claims for Employment Agreement benefits and to enforce rights under the terms of the plans pursuant to 29 U.S.C. §§ 1132(a)(1)(B) and 1140 (Second and Third Claims for Relief, respectively); claims for Salary Continuation Agreement benefits and to enforce rights under the terms of the plans pursuant to 29 U.S.C. §§ 1132(a)(1)(B) and 1140 (Fourth and Fifth Claims for Relief, respectively); in the alternative, breach of Bauer's and Clark's Salary Continuation Agreements (Sixth Claim for Relief); tortious interference with contract (Eighth Claim for Relief); in the alternative, discrimination under 29 U.S.C. § 1140 (Ninth Claim for Relief); and seeking a declaratory judgment as to an attorneys' fees provision (Seventh Claim for Relief). Doc. #1. In support of their Complaint, Plaintiffs attached:

1. Bauer's Employment Agreement,

2. Bauer's Salary Continuation Agreement,

3. Clark's Employment Agreement,

4. Clark's Salary Continuation Agreement,

5. Definitive Proxy Statement dated April 15, 2011,

6.  Agreement and Plan of Merger dated March 26, 2012,

7.  Amendment No. 1 to Agreement and Plan of Merger Agreement dated June 25, 2012,

8.  E-mail with Draft Amendments to Employment Agreement and Salary Continuation Agreement dated May 17, 2012,

9.  Form 10-K for Southern Community Financial Corporation dated December 31, 2011,

10. Letter from Clark's counsel to Southern Community Financial Corporation and Southern Community Bank & Trust dated July 3, 2012,

11. Letter from counsel for Southern Community Financial Corporation and Southern Community Bank and Trust to counsel for Clark dated August 15, 2012,

12. E-mail from counsel for Southern Community Financial Corporation and Southern Community Bank and Trust to counsel for Plaintiffs dated July 23, 2012, and

13. Notices of Termination.

Docs. #1-14.

In response, Defendants filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, alleging that the Complaint fails

to state a claim upon which relief can be granted. Doc. #29. Defendants argue that Plaintiffs are not entitled to change in control payments because they were terminated prior to the change in control, federal banking laws and the Troubled Asset Relief Program ("TARP") prohibit the golden parachute payments Plaintiffs seek, the Employee Retirement Income Security Act of 1974 ("ERISA") preempts certain state law claims, and the Complaint fails to state a claim for tortious interference with contract and for attorneys fees. See Doc. #30. Plaintiffs filed their Response Brief in Opposition to Motion to Dismiss, [Doc. #33], and Defendants filed their Reply Brief in Support of Motion to Dismiss, [Doc. #36].

III.

As an initial matter, five days before filing their Brief in Support of their Motion to Dismiss, Defendants filed a Motion to Enlarge Page Limit seeking an additional ten pages beyond the twenty pages permitted by Local Rule 7.3(d). Doc. #28. In their motion, Defendants note that "Plaintiffs have communicated their consent to this motion so long as they receive an equal enlargement for their response brief to Defendants' motion to dismiss." Id. at 2. Not having heard from the Court, Defendants filed their thirty-page Brief, [Doc. # 30]. Had the Court ruled on Defendants' motion at the time it was filed, the motion

would have been denied, and Defendants would have been required to submit a brief in compliance with Local Rule 7.3(d). However, in fairness and on this one occasion, because the motion was not ruled on contemporaneously, Defendants' Motion to Enlarge Page Limit, [Doc. #28], is GRANTED. Plaintiffs, on the other hand, did not file a motion to enlarge the page limit, but filed a thirty-one page brief nonetheless. <u>See</u> Doc. #33. Likely this was because the parties consented to each other's thirty-page briefs, but such consent is not for the parties to give, considering Local Rule 7.3(d). However, in fairness and on this one occasion, because the Court considered Defendants' thirty-page brief, the Court has also considered Plaintiffs' brief in its entirety.

One week after filing their Reply Brief in Support of Motion to Dismiss, Defendants filed a Motion for Leave to File Corrected Reply Brief, seeking to revise a parenthetical case citation. Doc. #37. Defendants' Motion for Leave to File Corrected Reply Brief, [Doc. #37], is GRANTED.

IV.

Before addressing the merits of the parties' arguments, the Court "independently must 'assess its subject-matter jurisdiction.'" <u>Yarber v. Capital Bank</u>, 944 F. Supp. 2d 437, 443 (E.D.N.C. 2013) (quoting <u>Constantine v. Rectors & Visitors of George Mason Univ.</u>, 411 F.3d 474, 480 (4th Cir. 2005)).

Plaintiffs allege federal subject matter jurisdiction based on ERISA, including 29 U.S.C. §§ 1132 and 1144(a), and supplemental jurisdiction of state claims. Compl. ¶ 10. Plaintiffs' Second, Third, Fourth, Fifth, and Ninth Claims for Relief allege claims under ERISA, specifically 29 U.S.C. §§ 1132(a)(1)(B) and 1140, Compl. ¶¶ 94-112, 135-38, whereas Plaintiffs' First, Sixth, Seventh, and Eighth Claims for Relief allege breach of contract and tortious interference with contract and seek a declaratory judgment as to attorneys' fees, id. ¶¶ 85-93, 113-34. Because the parties lack complete diversity for purposes of jurisdiction under 28 U.S.C. § 1332, whether or not ERISA applies to the benefits at issue in the Employment Agreements or the Salary Continuation Agreements determines the Court's jurisdiction over the instant action. After applying the relevant factors to the contested benefits, the Court concludes that ERISA does not apply to the benefits at issue in the Employment Agreements or the Salary Continuation Agreements and, therefore, that there is no federal subject matter jurisdiction over the action.

ERISA applies to any employment welfare benefit plan if it is established and maintained by any employer engaged in commerce or in any industry or activity affecting commerce. 29 U.S.C. § 1003(a)(1). An "employee welfare benefit plan" is "any plan, fund, or program" that is "established or maintained

by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants" medical benefits, benefits in the event of unemployment, accident, sickness, death, or disability, vacation benefits, and the like. Id. § 1002(1). In other words, ERISA applies to an employment benefit plan, not to an employment benefit. "The words 'benefit' and 'plan' are used separately throughout ERISA, and nowhere in the statute are they treated as the equivalent of one another. Given the basic difference between a 'benefit' and a 'plan,' Congress' choice of language is significant in its pre-emption of only the latter." Ft. Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 8 (1987) (finding state statute was not preempted by ERISA because it did not require employer to maintain an employee welfare benefit plan). See also Lomas v. Red Storm Entertainment, Inc., 49 F. App'x 396, 400 (4th Cir. 2002) (noting that the Fort Halifax Court "made clear that ERISA regulates employee benefit plans, not simply employee benefits"); Donovan v. Branch Banking & Trust Co., 220 F. Supp. 2d 560, 564 (S.D.W.Va. 2002) ("Not every agreement that provides for the payment of severance benefits, however, is an ERISA plan. ERISA was intended to provide for the federal regulation of plans, not merely benefits.") (internal citation omitted). Unlike a benefit, a benefit plan "requires an ongoing administrative

program to meet the employer's obligation." <u>Ft. Halifax</u>, 482 U.S. at 11.

Courts have adopted a number of factors[7] to determine if a particular benefit requires an ongoing administrative scheme such that it would be considered a benefit plan. These factors include: (1) the amount of managerial discretion granted in paying the benefits and whether a case-by-case review of employees is needed, (2) whether the payments are triggered by a single, unique event in the course of business or on a recurring basis, (3) whether the employer must make a one-time, lump-sum payment or continuous, periodic payments, and (4) whether the employer undertook any long-term obligations with respect to the payments. <u>See, e.g.</u>, <u>id.</u> at 12; <u>Yarber</u>, 944 F. Supp. 2d at 444 (finding change in control provisions in contract to require an ongoing administrative program; <u>Mullaly v. Ins. Servs. Office, Inc.</u>, 395 F. Supp. 2d 290, 295 (M.D.N.C. 2005) (finding severance payments under contract to require more than a minimal ongoing administrative scheme); <u>Donovan</u>, 220 F. Supp. 2d. at 564-65 (finding agreement did not require ongoing administrative scheme). The analysis of whether or not a benefit or agreement is covered by ERISA "necessitates a fact-specific application of the above mentioned factors, typically none of which on its own is determinative." <u>Donovan</u>, 220 F. Supp.

_____

[7] The application of these factors appears most often in cases evaluating severance benefits.

2d at 565 (citations omitted). However, the degree of discretion afforded management "is generally considered the most significant factor." <u>Caffrey v. Four Oaks Bank & Trust Co.</u>, No. 5:10-CV-341-FL, 2011 WL 2580674, *5 (E.D.N.C. June 29, 2011) (finding agreements required ongoing administrative scheme and citing <u>Blair v. Young Phillips Corp.</u>, 158 F. Supp. 2d 654, 659 (M.D.N.C. 2001)); <u>see also</u> <u>Fair v. Giant of Maryland LLC</u>, No. DKC2005-1306, 2006 WL 361338, *7 (D. Md. Feb. 15, 2006) (finding agreement required ongoing administrative scheme and stating "[T]he level of individualized consideration and employer discretion in eligibility determinations[] weighs heavily in the courts' analysis") (citing case law from the Fifth, Eighth, and Ninth circuits). Courts have found that the more discretion an agreement gives an employer, "'the greater likelihood that the agreement requires an ongoing administrative scheme.'" <u>Caffrey</u>, 2011 WL 2580674, *5 (quoting <u>Blair</u>, 158 F. Supp. 2d at 659). "On the other hand, simple or mechanical determinations requiring no discretion by the employer weigh against finding an ERISA plan." <u>Caffrey</u>, 2011 WL 2580674, *5 (citing Eighth and Fifth Circuit case law).

## A.

Although Plaintiffs first allege that Defendants breached the Employment Agreements, they also bring claims, in the alternative, under ERISA. In their

Second Claim for Relief, Plaintiffs allege, pursuant to 29 U.S.C. §
1132(a)(1)(B), that

> Defendants have failed to provide benefits and rights due under the
> plans created by the Employment Agreements, including the
> assumption by Capital Bank of the obligations under the
> Employment Agreement, including the obligation to provide benefits
> called for in the event of a 'Change in Control,' and/or by failing to
> provide Plaintiffs compensation equivalent to such benefits. Those
> Change in Control benefits include a lump sum payment and the
> continuation of various insurance and benefit plans. In the
> alternative, Defendants have failed to provide the benefits called for
> in the 'termination without cause section.'

Compl. ¶¶ 94–98. In their Third Claim for Relief, Plaintiffs also allege violations
of 29 U.S.C. § 1140 with respect to the Employment Agreements. Id. ¶¶ 99-
103. Therefore, there are two benefits in the Employment Agreements at issue
– Change in Control benefits and Termination Without Cause benefits.

1.

Whether or not the Change in Control benefits in the Employment
Agreement create a benefit plan turns on the application of the factors listed
above. The first factor weighs against finding an ERISA plan. There is no
managerial discretion granted in paying Change in Control benefits and an
employee-by-employee review is not needed. Section 5.1(a) of the Employment
Agreements provides that "[i]f a Change in Control occurs during the term of
this Employment Agreement, the Employer shall make or cause to be made a

15

lump-sum payment to the Executive [no later than five days after the Change in Control] in an amount in cash equal to three times the Executive's annual compensation." (Emphasis added.)  In addition, Section 5.1(b) explains that the Employer "shall" cause the Executive to become fully vested in plans and "shall" contribute to the Executive's 401(k) any contributions to which the Executive is entitled.  Furthermore, both Change in Control and annual compensation are defined in Amendment Number One and in Section 5.1(a), respectively.  In sum, the Employer is required to make payment and take steps related to the Executive's retirement plans in the event of a Change in Control, and the payment's triggering event, calculation, and deadline are clearly defined by the Employment Agreement.  There is nothing discretionary about the payment or execution of Change in Control benefits. See Donovan, 220 F. Supp. 2d at 565-66 (finding "nothing discretionary about the timing, amount, or form of benefits" where employee receives a single lump-sum cash amount based on a specific method of calculation and the same level of insurance benefits upon the same terms and condition as existed immediately prior to employee's termination date). Cf. Caffrey, 2011 WL 2580674 (where plaintiffs were to be paid a specific sum following a change of control and material adverse effect, but neither change in control nor material adverse effect were

defined in the employment agreements); <u>Mullaly</u>, 395 F. Supp. 2d. at 295 (where employer would need to determine, as to each employee, whether the employee left for cause, no cause, voluntarily, or involuntarily, and such for cause reasons as "willful unsatisfactory performance" and "offensive behavior" are not defined and the type and seriousness of any violation of company policy or rule must be evaluated).

Likewise, the second factor does not suggest that an ongoing administrative scheme is required. The payment of Change in Control benefits is triggered by a single, unique event in the course of business, not on a recurring basis. Section 5.1(a) of the Employment Agreements requires that when a Change in Control occurs during the term of the Employment Agreement, the Employer pay the Executive his benefit. As defined in Amendment Number One, Change in Control means a change in ownership, a change in effective control, or a change in ownership of a substantial portion of assets of Southern Community Financial Corporation. When one of those events occurs, it triggers the provision of Change in Control benefits. <u>See</u> <u>Ft. Halifax</u>, 482 U.S. at 12 (finding that the requirement of payment of a one-time, lump-sum triggered by a single event - the termination of operations at a plant with 100 or more employees or the relocation of those operations more than

100 miles away – "requires no administrative scheme whatsoever to meet the employer's obligation"); <u>Donovan</u>, 220 F. Supp. 2d at 566 (finding that this factor did not implicate ERISA where severance payments came due upon the occurrence of specific triggering events, and the employer "merely had to determine whether a triggering event had occurred").

The third and fourth factors also lead to the conclusion that the Change in Control benefits in the Employment Agreement do not require an ongoing administrative scheme. Again, Section 5.1(a) specifically requires the Employer to make "a lump-sum payment . . . in an amount in cash equal to three times the Executive's annual compensation." Although the Employer does undertake additional obligations under the terms of the Employment Agreements, those obligations are not long-term. Pursuant to Section 5.1(b), the Executive also receives insurance and medical benefits under Sections 2.2 and 4.5, but those benefits are the same benefits that were in effect during the two years preceding the date of termination and only continue until the earliest of the Executive's return to employment, the Executive's death, or the end of the term remaining under the Employment Agreement at the time of termination.[8] The

---

[8] Section 1.4 defines the initial term of the Employment Agreement as the period beginning on April 28, 2006, the effective date, and ending three calendar years thereafter. On each anniversary of the effective date, the term is automatically extended for one additional year beyond the then-effective expiration date unless

Executive also receives a fully paid long-term care insurance policy owned by the Executive with any remaining policy premiums to be paid in full. These obligations to pay Plaintiffs insurance and medical benefits are not considered long-term, especially because the payment of cash is a one-time lump-sump payment, the insurance benefits are the same benefits already in effect during the two years preceding the date of termination, and the Employment Agreement dictates that benefits cease upon the first to occur of one of three specific events. See Yarber, 944 F. Supp. 2d at 445 (explaining that factors three and four weighed against finding an ERISA plan even though the employment agreement required severance payments to be paid monthly for as long as three years, because the payment amounts are mathematically determined and paid for a limited time); Donovan, 220 F. Supp. 2d at 565-66 (concluding that "the lump-sum cash payment and the one-year payment of medical, dental, accident, disability, and life insurance benefits do not require an ongoing administrative process"). Therefore, the Change in Control benefits in the Employment Agreement do not require an ongoing administrative scheme and, therefore, do not constitute an ERISA plan.

---

written notice provides otherwise. At the time of Plaintiffs' termination, the remaining term of the Employment Agreements was through April 27, 2015.

2.

Just as the Change in Control provision in the Employment Agreement does not constitute an ERISA plan, neither does the Termination Without Cause provision. First, although execution of the Termination Without Cause benefits involves more discretion and case-by-case review than the Change in Control benefits, this factor ultimately does not weigh in favor of finding an ERISA plan. It is true that the Employer would have to determine if the Executive were terminated for cause.[9] Some courts find that a "for cause" determination grants enough managerial discretion to create an ongoing administrative

---

[9] Importantly, in this case, for most of term of the Employment Agreements, Southern Community Financial Corporation would not have been able to exercise any discretion to determine whether Bauer or Clark were terminated with or without cause. As of December 5, 2008, Southern Community Financial Corporation was a recipient of funds as part of the TARP. Compl. Ex. 5 (Definitive Proxy Statement) at 29 & Ex. 9 (Form 10-K) at 9. The Termination Without Cause benefits include a continuation of compensation. In Bauer's and Clark's case, those benefits total $1,203,796 and $772,316, respectively. Compl. ¶ 33. "To comply with the standards established under [the Emergency Economic Stabilization Act of 2008], a TARP recipient must prohibit any golden parachute payment to a [senior executive officer]." 30 C.F.R. § 30.9. A golden parachute payment is "any payment for the departure from a TARP recipient for any reason, or any payment due to a change in control of a TARP recipient . . . except for payments for services performed or benefits accrued." Id. at § 30.1. Compensation benefits for Termination Without Cause under the Employment Agreement are not for services performed or benefits accrued, but are instead a continuation of the Executive's most recent Base Salary level for the unexpired term of the Employment Agreement. Southern Community Financial Corporation would have had no discretion in determining the application of this provision. It simply was prohibited by law from allocating the Termination Without Cause benefits as of December 5, 2008 until the United States Department of Treasury was repaid, which, as of Plaintiffs' termination, had not occurred. See Compl. ¶ 67 (". . . TARP funds were to be repaid at the time of closing of the acquisition at issue . . .").

scheme. See, e.g., Mullaly, 395 F. Supp. 2d at 295 (noting that courts have held discretionary determinations of cause to weigh heavily in favor of an ERISA plan).

However, other courts have found a determination of "cause" not enough to implicate ERISA. Where, as here, key terms are defined and there is actually no discretion in the timing, amount, or form of payment, this factor does not weigh in favor of finding an ERISA plan, despite the necessary determination of "cause." See Delaye v. Agripac, Inc., 39 F.3d 235, 237 (9th Cir. 1994) (finding that the severance payment provision that included a determination of "for cause" in an employment contract was not an ERISA plan because "there [was] nothing discretionary about the timing, amount or form of the payment" in "[s]ending Delaye, a single employee, a check every month plus continuing to pay his insurance premiums for the time specified") cited in Mullaly, 395 F. Supp. 2d at 296 (explaining that although determining "for cause" was discretionary, other factors in the court's analysis in Delaye led to the conclusion that the benefit was not a plan) & Blair, 158 F. Supp. 2d at 660 (citing Delaye for the proposition that courts have not always found the "for cause" determination enough to create an ERISA plan). Cf. Mullaly, 395 F. Supp. 2d at 295 (finding that this factor weighed in favor of an ERISA plan

because the reasons for termination "for cause," willful unsatisfactory performance and offensive behavior among others, were not defined).

Here, "Cause" is defined in Section 3.1(c), and such determinations would only be made on a limited basis, because the Employment Agreement is drafted for Executives only. There is also "nothing discretionary about the timing, amount or form of payment." Section 3.1(b) states that upon termination, the compensation and benefits after termination provisions of Sections 4.4 and 4.5 "shall apply." Section 4.4 explains that after termination, "the Executive shall continue to receive his most recent Base Salary level [which is defined in Section 2.1] for the unexpired term of [the] Employment Agreement." If the Executive previously received Change in Control compensation, the "Employer and the Executive acknowledge and agree that the compensation and benefits under this Section 4.4 shall not be payable." Section 4.5 provides that after termination, "the Employer shall continue or cause to be continued at the Employer's expense life, disability, medical, and long-term care insurance benefits in effect during the two years preceding the date of the Executive's termination." Those benefits "shall continue" until the earliest of one of three distinct events. "Nothing in this Section 4.5 diminishes the Employer's obligation under Section 2.2 to provide the Executive with a

fully paid long-term care insurance policy . . . and any remaining policy premiums shall be paid in full." In sum, although the "for cause" determination may be discretionary and require some case-by-case review, the remainder of the Termination Without Cause benefits provisions allow for no discretion on the part of the Employer.

The next factor clearly does not lead to the finding of an ERISA plan. The Termination Without Cause compensation is triggered by a single, unique event in the course of business - termination of employment without cause. Section 3.1(b) explains that "[w]ith written notice to the Executive 60 days in advance, the Employer may terminate the Executive's employment without Cause. Upon such event, the compensation and benefits after termination provisions of Sections 4.4 and 4.5 shall apply." (Emphasis added.) Similarly, Section 4.4 states that "[i]f the Employer terminates the Executive's employment without Cause . . . , the Executive shall continue to receive his most recent Base Salary level . . ." and insurance and medical benefits.

The third and fourth factors also do not suggest the need for an ongoing administrative scheme. Although the Employer must make continuous, periodic compensation payments, such an obligation is for a limited time. Section 4.4 explains that the Executive shall continue to receive his most recent Base Salary

level for the unexpired term of the Employment Agreement. As of Plaintiffs' termination, the Employment Agreement was to expire on April 27, 2015, leaving approximately two and a half years of the unexpired term during which the Employer must pay the Executive. Likewise, insurance and medical benefits in effect during the two years preceding the termination date continue only until the first to occur of the Executive's return to work, the Executive's death, or the expiration of the Employment Agreement. Therefore, although the Executive is not receiving a one-time lump-sum payment, but instead continues to receive his base salary for the expiration of the Employment Agreement, the Employer's obligation to provide these benefits is limited, and the benefits themselves are clearly defined. See Yarber, 944 F. Supp. 2d at 445 (finding that the provision of monthly severance payments for as long as three years did not implicate ERISA because those payments were mathematically determined and provided for a limited time).

In sum, neither the Change in Control provision nor the Termination Without Cause provision in the Employment Agreements constitute an ERISA plan. They do not require an ongoing administrative scheme. Instead, they are each merely a benefit afforded to the Executive who is a party to the Employment Agreement.

B.

Plaintiffs also allege that ERISA applies to their Salary Continuation Agreements.  In their Fourth Claim for Relief, Plaintiffs allege, pursuant to 29 U.S.C. § 1132(a)(1)(B), that Defendants have failed to provide benefits and rights due under the plans created by the Salary Continuation Agreements, specifically that Southern Community and Capital Bank

> refused to ensure that Capital Bank assumed and agreed to perform the obligations under the Salary Continuation Agreements, including the obligation to provide benefits called for in the event of a 'Change in Control,' and/or failed to provide Plaintiffs adequate compensation to provide relief for the extinguishment of such rights under the Salary Continuation Agreement.

Compl. ¶¶ 104-108.  In their Fifth Claim for Relief, Plaintiffs also allege violations of 29 U.S.C. § 1140. Id. ¶¶ 109-112.

1.

The first factor does not implicate ERISA, because there is no discretion granted to management in paying Change in Control benefits under the Salary Continuation Agreements.  Section 2.4 of Bauer's Salary Continuation Agreement explains that "[i]f a Change in Control occurs after the Effective Date of this Agreement but before the Executive's Normal Retirement Age and before his Separation from Service, the Bank shall pay to the Executive the benefit described in this Section 2.4(a) . . ." in a single lump sum within ten

days after the Change in Control. Section 2.4(a) provides that the benefit "is equal to the Normal Retirement Age Accrual Balance required under Section 2.1, without discounting for the time value of money." Section 2.4(a) then defines and calculates Bauer's Normal Retirement Age Accrual Balance on the Effective Date of the Agreement. Section 2.4(a) of Clark's Salary Continuation Agreement, which reads slightly differently than Bauer's, provides that the benefit is the sum of "the Accrual Balance existing when the Change of Control occurs" plus "half of the difference between the Normal Retirement Age Accrual Balance required by Section 2.1 and the Executive's Accrual Balance as of the date of the Change in Control, without discounting for the time value of money." It then defines and calculates Clark's Normal Retirement Age Accrual Balance on the Effective Date of the Salary Continuation Agreement.

Section 2.5 also provides that if a Change in Control occurs during the salary continuation benefit payment period and the Executive is receiving or is entitled to receive at his Normal Retirement Age the benefit provided in Sections 2.1(b), 2.2(b), or 2.3(c),[10] Southern Community Bank and Trust "shall

---

[10] Sections 2.1(b) (Section 2.1(f) in Clark's case) and 2.2(b) refer to payment of Normal Retirement Benefits and Early Termination Benefits, respectively. Clark's Salary Continuation Agreement does not have a Section 2.1(b). It is likely that Section 2.1(f) was intended to be Section 2.1(b) were it not for the typographical error. Neither Clark's nor Bauer's Salary Continuation Agreement have a Section 2.3(c).

pay in a lump sum the present value of the Actuarial Equivalent of any remaining salary continuation benefits to the Executive in a single lump sum within ten (10) days after the Change in Control." In both Salary Continuation Agreements, Change in Control, Effective Date, Normal Retirement Age, Separation from Service, Accrual Balance, Discount Rate, and Actuarial Equivalent are defined. The triggering event, method of payment, and calculation of payment are all detailed in the Salary Continuation Agreement. As is evident, there is no managerial discretion with respect to paying Change in Control benefits. Cf. Yarber, 944 F. Supp. 2d at 444; Caffrey, 2011 WL 2580674 at *5; Mullaly, 395 F. Supp. 2d at 295.

Likewise, the second factor does not suggest the need for an ongoing administrative scheme. The payment of Change in Control benefits is triggered by a single, unique event in the course of business – the occurrence of a Change in Control, which is defined in Section 1.4 as a change in ownership, a change in effective control, or a change in ownership of a substantial portion of assets of Southern Community Financial Corporation. Sections 2.4 and 2.5 explain that "[i]f a Change in Control occurs" at a given time, the Executive shall be paid related benefits. As is evident, this factor does not implicate ERISA.

The third and fourth factors also clearly do not require an ongoing administrative scheme.  As explained above, Sections 2.4(b) and 2.5 require that, if a Change in Control occurs, the Employer must pay the Executive the benefits in a single, lump-sum payment within ten days. See Mullaly, 395 F. Supp. 2d at 296; Donovan, 220 F. Supp. 2d at 565-66.

Therefore, the factors as applied to the Change in Control provision of the Salary Continuation Agreement do not implicate ERISA, because the Change in Control benefits do not require an ongoing administrative scheme.

## V.

It is determined after applying the relevant factors to the Change in Control benefits and Termination Without Cause benefits of the Employment Agreements that neither require an ongoing administrative scheme for their execution, and, thus, neither constitute an employee welfare benefit plan under ERISA.  It is further determined after applying the relevant factors to the Change in Control benefits of the Salary Continuation Agreements that they do not require an ongoing administrative scheme for their execution, and, thus, are not an employee welfare benefit plan under ERISA.  Therefore, because ERISA does not apply in the instant action and there is no other ground for federal jurisdiction, the Court lacks subject matter jurisdiction to hear the case.

Therefore, Defendants' Motion to Dismiss is DENIED as MOOT.

VI.

For the reasons set forth above, Defendants' Motion to Enlarge Page Limit, [Doc. #28], is GRANTED; Defendants' Motion for Leave to File Corrected Reply Brief in Support of Motion to Dismiss, [Doc. #37], is GRANTED; Defendants' Motion to Dismiss, [Doc. #29], is DENIED as MOOT; and the case is DISMISSED for lack of subject matter jurisdiction.

This the 28th day of October, 2014.


/s/ N. Carlton Tilley, Jr.
Senior United States District Judge